UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CAROL KARL GRAHAM, | |
| Plaintiff, | Case No. 20-12137 |
| | Honorable Laurie J. Michelson |
| v. | |
| CARETECH SOLUTIONS, INC., CIBER GLOBAL, LLC, HTC GLOBAL ACQUISITION, LLC, and HTC GLOBAL SERVICES, INC., | |
| Defendants. | |

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [20] AND GRANTING PLAINTIFF'S MOTION TO FILE SUR-REPLY [26]**

---

Carol Karl Graham began working for CareTech Solutions, Inc. in 2001, and the first 15 or so years on the job were without significant issue. But in 2016, Graham began reporting to Jill Fossano. Graham says that soon after Fossano became his supervisor, she made sexually inappropriate remarks such as pointing to her breasts and stating, "sales is about this" or swinging one of her legs over a bench and saying, "don't worry about it, I have on tights." Graham reported these remarks to human resources, and CareTech's president directed Fossano to act professionally.

But, says Graham, Fossano's harassment continued. She allegedly rubbed her breasts on Graham's head, jumped into his lap, slapped his butt, and placed phone chargers down the back of his pants. Graham again reported the incidents to human resources. But then, says Graham, he was retaliated against. His supervisor began

to scrutinize his performance more harshly and stripped him of 90 percent of his job responsibilities after he reported Fossano. In August 2019, Graham was fired, in part because his supervisor thought his performance was deficient.

In time, Graham sued CareTech and associated companies. Graham alleges that Defendants permitted a sexually hostile work environment in violation of federal and state employment laws. Graham further alleges that after he complained about Fossano, Defendants retaliated against him, also in violation of federal and state employment laws.

Defendants now seek summary judgment. As will be detailed below, the Court concludes that a reasonable jury could find that Defendants are liable for a sexually hostile work environment. But, as also detailed below, no reasonable jury could find that Defendants retaliated against Graham for complaining about Fossano. So Defendants' motion will be granted in part and denied in part.

## I.

## A.

Because Defendants seek summary judgment, when the parties dispute what happened, the Court accepts Graham's version of the events as true. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 1.

In 2001, Graham started working for CareTech Solutions, Inc. (ECF No. 20-3, PageID.179.) CareTech's "service desk" provided technology support to other businesses, including healthcare systems. (ECF No. 20-3, PageID.180–181, 188–189.) In his role as an information technology director, Graham oversaw the service desk

2

and worked on selling service-desk contracts. (*Id.*) For his first 14 or so years at CareTech, Graham's job remained largely the same. (ECF No. 20-3, PageID.181.)

In December 2014, CareTech became a wholly-owned subsidiary of HTC Global Services, Inc. (ECF No. 20-2, PageID.133–134.) Not long after HTC's acquisition of CareTech, Graham was given a new role: vice president of business development for CareTech. (ECF No. 20-2, PageID.133; ECF No. 20-3, PageID.196.) In this new role, Graham focused more on selling the service-desk product than on its operation. Although salespeople were primarily responsible for working with customers, Graham would support the salespeople by providing advice, proposing solutions, and presenting solutions to the customer. (ECF No. 20-3, PageID.197–198, 200–201.)

2.

In September 2016, Graham began reporting directly to Jill Fossano, the Senior Vice President of Business Development for CareTech. (ECF No. 20-3, PageID.204–205.) According to Graham, during their first few months of working together, Fossano sexually harassed him.

The first incident occurred during a "get to know [you] kind of meeting." (ECF No. 20-3, PageID.206.) Graham recalls, "in that meeting [Fossano] told me that sales is about this, and she was pointing to her breast area." (ECF No. 20-3, PageID.206.)

A few months later, in December 2016 or January 2017, Fossano, Graham, and others went on a business trip to New Jersey; Graham recalls Fossano engaging in sexually inappropriate conduct on the trip. One incident occurred at the airport. According to Graham: "[Fossano] was sitting on the bench, and I'm sitting in front of

her, and she swang her leg over, and I was taken aback that she just did that, and her response was, don't worry about it, I have on tights." (ECF No. 20-3, PageID.224.) Another incident occurred at the hotel. Graham recalls that he was working on a PowerPoint presentation for the New Jersey customer and Fossano said that if he did not finish the presentation quickly, she would "wrap his penis around his neck." (ECF No. 20-3, PageID.216.) And when Graham responded that the comment was inappropriate, Fossano replied, "I'll just call your wife and tell her that you're cheating." (*Id.*) Graham also recalls a third incident on the New Jersey trip: "[three of us] were talking about how to, how we were going to present to the [customer's] CIO. And [Fossano] says, do I wear my leather skirt; does he think he's big in his pants?" (ECF No. 20-3, PageID.227.)

A month or two after the trip, in late February 2017, Graham emailed Venu Vaishya about Fossano's conduct. (ECF No. 20-14, PageID.713–714.) Vaishya, an engineer, had been HTC's Executive Vice President of Operations for many years; but after HTC acquired CareTech, he additionally served as CareTech's Vice President of Human Resources. (ECF No. 20-5, PageID.560, 562–563.) In a document titled "Inappropriate and Awkward Communication," Graham reported to Vaishya that "she"—Graham did not name Fossano in the document—"frequently refers to her breast in a sexually suggestive way." (ECF No. 20-14, PageID.714.) Graham further claimed that he had heard her say, "I will go after anyone who crosses me." (*Id.*) Graham also reported the "big in his pants," the "don't worry, I'm wearing tights," the

4

"penis around your neck," and the "call your wife and tell her you are cheating"
remarks. (*Id.*)

Shortly after receiving Graham's email, Vaishya met with Graham to discuss
his accusations. Vaishya recalls that Graham did not want to file a formal complaint:
"I asked him specifically, are you making a formal complaint about Jill [Fossano]? He
said, no; I wanted to bring it to your attention." (ECF No. 20-5, PageID.581.) Graham
recalls the meeting quite differently. According to Graham, "[Vaishya's] response to
me was . . . listen, you're not the only person that reported [Fossano]. [CareTech
President Tommi White] and I have already met with her, and . . . I will take care of
it." (ECF No. 20-3, PageID.232–233; *see also* ECF No. 20-18, PageID.724.) Graham
further remembers, "I said to [Vaishya], there's a threat in there that says I will call
your wife and tell her you are cheating, and also, that . . . she goes after anyone that
crosses her. So I'm uncomfortable right now if you meet with her and tell her that I
am the one, that I reported this, and I'm concerned about reprisal." (*Id.*) Graham
remembers Vaishya responding, "Karl, you don't have to worry about that. We will
take care of it in such a way she won't know it's you." (*Id.*)

Under either account, CareTech did address Graham's concerns with Fossano.
Vaishya says he talked with CareTech President Tommi White, and White "in
turn, . . . talked to [Fossano] and [said], conduct yourself . . . professionally in the
workplace." (ECF No. 20-5, PageID.582.)

3.

While White's instruction to Fossano to act professionally might have sufficed for a bit, Graham says that during the two years following his February 2017 report, Fossano continued to sexually harass him.

One instance, which apparently occurred in or around July 2017, involved Fossano rubbing her breasts on Graham's head when Graham, Fossano, and a third employee, Paula Gwyn, were at dinner. Graham recalls, "Paula left [the table] and went to her room, and [Fossano] got up, and she walked behind me and she rubbed her breasts on me . . . . [B]ased on her height and where she stands, and where I was sitting, I felt a thing rub, and I looked up, and I saw . . . her breasts . . . was right there." (ECF No 20-3, PageID.263; *see also* ECF No. 20-3, PageID.293.) While Fossano rubbed herself on Graham, she allegedly said something like, "I know you don't like it, [Vaishya] told me that you reported me. THEY TELL ME EVERYTHING! EVERYTHING!" (ECF No. 20-16, PageID.719; *see also* ECF No. 20-14, PageID.712.)

It appears that something very similar happened on another occasion. The incident where Fossano said "they tell me everything!" apparently occurred in or around July 2017. (*See* ECF No. 20-14, PageID.712 (referencing "next trip" after February 2017 report); ECF No. 23-2, PageID.818 (referencing July 2017); ECF No. 20-3, PageID.336, 379 (indicating 2017).) But Graham also asserts that there was an incident where Theresa Ledesma (as opposed to Paula Gwynn) had been present. (ECF No. 20-18, PageID.724; ECF No. 20-3, PageID.262–263, 301.) According to Graham, he felt something on his head while Ledesma was laughing; Ledesma asked

6

Graham if he knew what it was, and when Graham turned around, he discovered it was Fossano's breasts. (ECF No. 20-18, PageID.724.)

In the fall of 2017, Fossano jumped into Graham's lap. Fossano was excited about a contract renewal that Graham had helped secure. (ECF No. 20-19, PageID.736, 740.) Graham recalls, "Chris Wickersham and I were in the office, and [Fossano] came screaming, and she jumped in my lap." (ECF No. 20-3, PageID.308.) According to Graham, after Fossano left, Wickersham said, "what the heck is that; what if [your wife] happened to just come into the office and saw all of this?" (ECF No. 20-3, PageID.311.)

As will be explained in greater detail below, in July 2018, Graham stopped reporting to Fossano and began to report to Vani Prasad. (ECF No. 20-4, PageID.434–436, 460–461.) Prasad, who had been a longtime HTC vice president, started becoming directly involved with CareTech in March 2018. (ECF No. 20-4, PageID.434.) Graham recalls that a few months before Prasad became his direct supervisor, he had told Prasad that Fossano had made sexually suggestive statements to him and that he was uncomfortable. (ECF No. 20-3, PageID.258.) But even Graham does not believe that the change in the reporting structure was due to this discussion with Prasad (ECF No. 20-3, PageID.259), and Prasad explains that the change was for business reasons (ECF No. 20-4, PageID.466–467). Under the new structure, both Graham and Fossano reported directly to Prasad.

Despite that Fossano was no longer Graham's supervisor, she allegedly continued to harass Graham. In the fall of 2018, Fossano allegedly walked into

7

Graham's office and placed a binder clip on Graham's nipple and walked off. (ECF No. 20-3, PageID.298; *see also* ECF No. 20-18, PageID.724.) And in January 2019, Fossano slapped (or squeezed) Graham's butt. (ECF No. 20-15, PageID.717.) Graham recalls that the two were at a convention center setting up or taking down a CareTech booth and that "[Fossano] came over, and she slapped me on my buttocks." (ECF No. 20-3, PageID.285–286; *cf.* ECF No. 20-17, PageID.721 (claiming that Fossano "squeezed" his buttocks).) When Graham said, "Jill, you can't do that," Fossano simply laughed. (ECF No. 20-3, PageID.285.)

4.

The butt-slap incident at the booth prompted Graham to make another report about Fossano's conduct.

According to Graham, upon returning from the conference (mid-January 2019), he met with his supervisor, Prasad. (ECF No. 20-3, PageID.283, 288–289; *but see* ECF No. 20-4, PageID.495 (indicating report to Prasad was in February 2019); ECF No. 20-24, PageID.761 (same).) Graham recalls, "I specifically told [Prasad] that while we were at the booth, she came over, and she slapped me on my buttocks. . . . And I said to him that there are cameras all over the place, and that he should request the information from them. And [Prasad] said he will do that, and he's going to talk to HR." (ECF No. 20-3, PageID.285.) Prasad recalls, "I went within the hour, walked up to HR and conveyed that, 'Karl is going to probably come meet with you all. He's got a complaint.'" (ECF No. 20-4, PageID.497.) Prasad further recalls, "I just said what I heard, what I thought I heard, that it seems that Jill has spanked him on the back

8

and he felt offended by it and he intends to lodge a complaint." (ECF No. 20-4, PageID.497.)

In late February 2019, Graham and Prasad exchanged emails regarding the butt slap at the booth. Graham provided Prasad with the exact date of the incident, January 10, 2019. (ECF No. 20-15, PageID.717.) Prasad responded, "I will certainly talk to Jill when she is back after her surgery. Thanks for your patience till then." (*Id.*) Graham, apparently referring to his 2017 "Inappropriate and Awkward Communication" document, responded, "Please remember to review my files. I report[ed] to HR that she stated that 'She goes after anyone who crosses her.'" (ECF No. 20-15, PageID.716.)

On March 4, 2019, Graham met with two people from human resources about Fossano's conduct. (ECF No. 20-16, PageID.719.) In particular, Graham met with Vaishya, the HR vice president who handled his February 2017 complaint, and Peter Cleveland, also from HR. According to the meeting notes, Graham reported two incidents to Vaishya and Cleveland. The first incident that Graham shared was relayed to him by another employee, Marcelle Wallace. (*See* ECF No. 20-3, PageID.294.) Wallace had told Graham that while she was on a business trip, she went to Fossano's room to give her something; Fassano allegedly "asked her to lay under the sheet with her in the bed." (ECF No. 20-16, PageID.719.) The meeting notes further stated, "Marcelle also indicated to [Graham] that Jill Fossano had kissed her twice on the lips." (ECF No. 20-16, PageID.719.) (It was subsequently clarified that Fossano attempted to, but did not, kiss Wallace. (ECF No. 20-3, PageID.293.)) The

9

second incident discussed at the March 4 meeting was the one where Fossano rubbed Graham's head at the dinner table and stated, "[Vaishya] told me that you reported me. THEY TELL ME EVERYTHING! EVERYTHING!" (ECF No. 20-16, PageID.719.) Upon hearing this, Vaishya denied telling Fossano that Graham had reported her. (ECF No. 20-16, PageID.719.) Notably, the meeting notes, which Graham later reviewed and approved, stated that Fossano rubbed her "hand" (not her breasts) on Graham's head. (*Id.*)

The day after the March 4 meeting, Graham emailed Cleveland a copy of his February 2017 complaint titled, "Inappropriate and Awkward Communication." (ECF No. 20-14, PageID.712.)

This email prompted Vaishya and Cleveland to meet with Graham for a second time. (*See* ECF No. 20-19, PageID.728.) At this March 6, 2019 meeting, Graham reported (among other things) several incidents that had occurred since his February 2017 report. He reported that Fossano had clipped his nipple with a binder clip, had "squeezed" his butt when the booth was being setup at the convention center, had rubbed her breasts on his head (while Ledesma laughed), and had jumped into his lap. (ECF No. 20-18, PageID.724–725.) Graham also reported that while on a conference call, Fossano made a comment about her or a male employee wearing a wet t-shirt earlier in the day; Graham did clarify, however, that no one on the call actually believed that anyone had worn a wet t-shirt. (ECF No. 20-18, PageID.724.)

As a result of the March 4 and 6 meetings, Vaishya and Cleveland decided to conduct an internal investigation. (ECF No. 20-20, PageID.746–747.) But it appears

that before Vaishya and Cleveland had even conducted their first interview, another incident occurred. On March 14, 2019, Graham had asked Fossano for some phone chargers or power connectors. According to Graham, "She picked them up from her office and drop[ped] them in [the] back [of my shirt] and pushed them in my pants. She then said 'now you have them in your tush.'" (ECF No. 20-20, PageID.745; *see also* ECF No. 20-3, PageID.322–323.) Graham immediately reported the incident to Prasad (his and Fossano's supervisor) and Vaishya and Cleveland. (ECF No. 20-3, PageID.323.) About a week later, Graham filed a police report about the phone chargers (and other instances where Fossano had harassed him). (ECF No. 23-2, PageID.816.)

5.

From mid-to-late March 2019, Vaishya and Cleveland interviewed employees about the incidents Graham had reported.

Two witnesses described the phone chargers incident as a joke. (ECF No. 20-19, PageID.730–732.) One of the two witnesses was specifically asked if Fossano said, "now you have them in your tush," and he could not confirm the comment. (ECF No. 20-19, PageID.730.) Vaishya also met with Fossano about the phone chargers. According to Vaishya's notes of that meeting, "[Fossano] acknowledge[d] that [her] action was inappropriate. [She] agreed not to repeat the same and exercise better judgement in line with professional behavior at [the] work place." (ECF No. 20-19, PageID.731.)

11

Although no one witnessed many of the other incidents reported by Graham—e.g., the butt slap—Cleveland and Vaishya still interviewed people who had worked with Fossano. One employee stated that he could not recall any sexual interactions with Fossano and that he did not remember any comment about a wet t-shirt. (ECF No. 20-19, PageID.735.) Another employee recalled a situation where Fossano lashed out at him by saying, "You don't understand the wrath of Jill"; but he also did not remember any comment about a wet t-shirt. (ECF No. 20-19, PageID.737.) A third employee (or, more precisely, former employee), was asked if he felt that Fossano had ever sexually mistreated him; the former employee responded that Fossano had a unique sense of humor that may be perceived incorrectly. (ECF No. 20-19, PageID.733.) This former employee also recalled a situation where Fossano said she would call his wife if he was "bad," but that it was intended as a joke and they both laughed. (*Id.*) Cleveland also asked Wickersham about Fossano jumping into Graham's lap; according to the interview notes, "Jill came into Karl's office to congratulate Karl on the signing of the BARN contract. She sat in his lap and hugged him. She then gave him a high-five, congratulated him again and left his office." (ECF No. 20-19, PageID.736.) But contrary to Graham's account that it was Wickersham who said, "what if [you're wife] was here?," Wickersham told Cleveland that it was Graham who said, "what if [my wife] was here?" (ECF No. 20-19, PageID.736.)

On March 26, 2019, Vaishya, Cleveland, and an HTC finance director met with Fossano at her request. According to Vaishya's meeting notes, "Jill said she is upset with Karl Graham because he is bringing [up] issues that were six months to two

year[s] old," and "Jill said Karl is picking up incidents to his advantage as he is worried about his job due to lack of performance." (ECF No. 20-19, PageID.740.) Fossano also complained that Prasad "ha[d] not been addressing Karl's work and interactions with the CareTech Business development Team." (ECF No. 20-19, PageID.739.) Fossano denied having any physical contact with Graham during the trip that Graham claimed he had been slapped on the butt. (ECF No. 20-19, PageID.739–740.) Fossano also denied sitting on Graham's lap or rubbing Graham's head. (*Id.*)

As a result of the internal investigation, CareTech took three remedial actions. First, "[Fossano] was . . . reprimanded . . . in writing, which went into her personnel record." (*Id.*) Vaishya recalls that he and the HTC finance director "had a conversation with [Fossano] on her behavior, and she apologized." (ECF No. 20-5, PageID.626.) White, CareTech's president, also spoke with Fossano. (*Id.*) Second, in March or April 2019, Graham was moved to a different floor. (ECF No. 20-5, PageID.627; ECF No. 20-19, PageID.740.) This not only helped reduce Graham and Fossano's interaction, but also allowed Graham to be closer to people he knew and worked with. (ECF No. 20-5, PageID.627.) Third, CareTech performed a company-wide harassment training. (ECF No. 20-3, PageID.385–386.)

After the March 2019 investigation, Fossano did not again harass Graham.

6.

About five months after the internal investigation, in August 2019, HTC terminated Graham's employment. The parties offer competing accounts of how that came to be.

As noted above, in July 2018, Graham started reporting directly to Prasad. That month, Prasad sent out a group email congratulating Graham on an "expanded role" and explaining that Graham would now not only help CareTech sell the service-desk product, but also help two other companies—HTC and Ciber Global, LLC—sell that product. (ECF No. 20-3, PageID.257; ECF No. 20-4, PageID.467.) (It appears that like CareTech, Ciber is a subsidiary of HTC. (ECF No. 20-2, PageID.134.)) Prasad later explained, "we wanted to take the service desk . . . across the organization . . . and Karl was, in my opinion, was a good business leader who has met customers, who can articulate the service desk." (ECF No. 20-4, PageID.460.) Prasad wanted Graham to focus less on operations and more on business development, and, in particular, wanted Graham to assist HTC and Ciber salespeople in closing deals. (*See* ECF No. 20-4, PageID.513, 517.) In fact, Prasad says that because he had directed people in CareTech operations and sales groups to be more responsible for their own work, Graham's duties with CareTech diminished over time; Prasad thus eventually asked Graham to work less with the CareTech team. (ECF No. 20-4, PageID.462–463, 513, 518–519.)

From Prasad's perspective, Graham did not succeed in his "expanded role." Prasad, who had not worked closely with Graham before March 2018, observed that

Graham's "ability, competency [was] not as strong" as he had hoped it would be. (ECF No. 20-4, PageID.520.) Prasad recalls that Graham was not drafting proposals. (ECF No. 20-4, PageID.522–523.) And, according to Prasad, over the entire time that he directly supervised Graham, not a single sales lead that Graham worked on ended up closing. (ECF No. 20-4, PageID.491.)

Prasad recalls that after he received sales figures for the second quarter of 2019, he needed to give Graham an ultimatum. (ECF No. 20-4, PageID.528–529.) So in late July 2019, Prasad sent Graham an email stating, "I was going to talk to you again about nothing being closed during Q2. This is not sustainable." (ECF No. 20-11, PageID.700.) Prasad then had an in-person meeting with Graham and told him, "If there is a plan [for improvement] in two weeks, I would like to see that. Otherwise, . . . you can leave after two weeks." (ECF No. 20-4, PageID.531; ECF No. 20-13, PageID.707.)

Following their meeting, Graham and Prasad exchanged emails. On July 25, 2019, Graham emailed Prasad: "Per our earlier discussion, you are giving me two weeks to find another job. I will therefore be fired on August 8th, 2019." (ECF No. 20-13, PageID.709.) To this, Prasad responded in part, "I am a bit surprised to see this message. As you are aware, since January we have been discussing about goals and outcomes, and this week's review after the two quarters again showed very little progress on the numbers." (ECF No. 20-13, PageID.709.) After some additional email exchanges, Graham emailed Prasad the following: "As you are aware, I was performing extremely well in my previous position. After I complained about the

severe and pervasive sexual harassment I was being subjected to, I was the one who was transferred, with no apparent consequences for Jill [Fossano]. In the new position I am unable to draw on the sales team and customers who contributed greatly to my success." (ECF No. 20-13, PageID.706.) Graham continued, "The 'plan that demonstrates improved performance' which I propose is that you return me to my previous position and take necessary steps so that I will not experience harassment issues with Jill. This step will definitely improve my performance." (ECF No. 20-13, PageID.706.)

Graham's remark about his "previous position" was apparently in reference to Prasad changing his job duties in April or May 2019. (ECF No. 20-3, PageID.362.) According to Graham, although his role expanded in July 2018 to include HTC and Ciber, those companies had few sales leads so "95 percent" of his work remained with CareTech. (ECF No. 20-3, PageID.265–267.) But Graham says that after he complained about Fossano in early 2019, "[Prasad] . . . stopped me from working with the [CareTech] sales team, so I'm only left with the other two companies [HTC and Ciber]. . . . So he took away my 90 percent, and now I'm left with 10 percent." (ECF No. 20-3, PageID.361.)

Graham also has a different perspective on his performance. Graham explains that no one was closing deals: "[Prasad] said, well, nobody is closing anything. So I said, so it's a universal problem? And he said, well, I don't care about universal; these things are not being closed. I said to him, you took away my job, and you assign me this, and within a month after you give me a new assignment, you're telling me I'm

16

not performing." (ECF No. 20-3, PageID.368; *see also* ECF No. 20-3, PageID.373.) Graham also explains that Prasad never discussed goals or metrics with him until after he complained about Fossano in early 2019. (ECF No. 20-3, PageID.275–276, 359.)

In August 2019, an executive team terminated Graham's employment. Prasad, who was part of the executive team, recalls that he never received a plan from Graham, and so Graham was terminated for "a combination of lack of performance and lack of a plan for continuing into the future." (ECF No. 20-4, PageID.539–540.) Vaishya (the HR vice president who investigated Graham's complaints about Fossano) was also part of the executive team. (ECF No. 20-5, PageID.601.) While Vaishya agrees that Graham's performance was a reason for his termination, he further explains that CareTech was undergoing downsizing. (ECF No. 20-5, PageID.601–602.) According to Vaishya, Graham's position was selected for elimination because "the profitability of the company[] and . . . [Graham's] performance." (*Id.*) For his part, Graham believes that his termination was retaliation for complaining about Fossano, or, at least, that Prasad retaliated by stripping him of CareTech work and more harshly scrutinizing his performance, which, in turn, led to his termination. (*See* ECF No. 23, PageID.795, 810; ECF No. 20-3, PageID.359, 361.)

## B.

In time, Graham sued CareTech, Ciber, HTC Global Services, and HTC Global Acquisition (collectively "HTC"). His complaint has four counts. In Counts I and III,

Graham says that HTC tolerated and promoted a sexually hostile work environment in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act. (ECF No. 1, PageID.7, 8.) In Counts II and IV, Graham claims that HTC violated Title VII and ELCRA by stripping him of 90 percent of his job duties and then terminating him because he complained of Fossano's harassment. (*Id.*)

The parties completed discovery, and now HTC seeks summary judgment pursuant to Federal Rule of Civil Procedure 56. (*See* ECF No. 20.)

## II.

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Or, stated less formally, HTC is entitled to summary judgment only if no reasonable jury could find in favor of Graham. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III.

The Court first examines Graham's hostile-work-environment claims; it then turns to his retaliation claims.

## A.

Whether under Title VII or ELCRA, to establish a hostile-work-environment claim, Graham must show (among other things) that he was (1) subject to harassment based on sex, (2) the harassment was sufficiently "severe or pervasive" to alter the conditions of employment, and (3) that HTC is liable. *Hunter v. Gen. Motors LLC*, 807 F. App'x 540, 545 (6th Cir. 2020). HTC attacks each of these elements, arguing that Graham has insufficient evidence of all three.

18

1.

The Court will address the "based on sex" and "severe or pervasive" elements together.

HTC's argument that Graham did not face "severe or pervasive" sexual harassment gets some support from the law. Generally speaking, "offhand" sexual comments and "isolated incidents" do not transform a workplace into a sexually hostile environment. *Hunter*, 807 F. App'x at 545 (internal quotation marks omitted). Indeed, "[Sixth Circuit] precedent presents a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Id.*

A couple of the cases cited by HTC exemplify this "relatively high bar."

In *Clark v. United Parcel Service*, the plaintiff presented evidence that her supervisor told sexual jokes in her presence and twice placed his vibrating pager on her upper thigh while asking if it felt good. 400 F.3d 341, 344–45 (6th Cir. 2005). And one day, the supervisor asked the plaintiff what she was wearing underneath her overalls; when the plaintiff responded, "a thong," the supervisor grabbed the back of her overalls and tried to look down them. *Id.* at 345. According to the Sixth Circuit, although the supervisor's conduct "could certainly be construed as offensive," no reasonable jury could find that it "was severe and pervasive enough to create a hostile workplace." *Id.* at 352.

HTC also relies on *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir. 2000). There, the plaintiff alleged that his supervisor rubbed his shoulder, that when he went to her house to help fix her deck, she stated "[l]et's get it finished, you

and I can try [the whirlpool] out together," and that when he and his girlfriend went swimming at his supervisor's house, she stated "[n]ext time, . . . you ought to come by yourself and enjoy yourself." *Id.* at 458–59. Additionally, when the plaintiff attended a Christmas party at his supervisor's house, she grabbed his butt; when the plaintiff stated that she would fire anyone who did that to her, the supervisor responded that she "controlled [his] ass" and that "she would do whatever she wanted with it." *Id.* at 459. The Sixth Circuit found that "[w]hile the allegations [were] serious," as a matter of law "they [did] not constitute conduct that is pervasive or severe." *Id.* at 464.

Although cases like *Bowman* and *Clark* lend support to HTC's claim that Graham did not face "severe or pervasive" sexual harassment, whether that threshold has been met is "quintessentially a question of fact," *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). And at this stage of the case, the evidence must be viewed in the light most favorable to Graham, and the Court must assume that a jury could credit his testimony. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Giving these legal standards their full due, HTC is not entitled to summary judgment on the basis that Graham's workplace was not hostile. To start, this case involves sexual touching—a factor that cuts strongly in favor of Graham. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) ("[O]ur precedent makes clear that harassment involving an element of physical invasion is more severe than harassing comments alone." (internal quotation marks omitted)). Sure, both *Clark*

20

and *Bowman* involved touching too. But unlike those cases, this case involves allegations that a superior rubbed her private parts on a subordinate. In fact, when the evidence is viewed in the light most favorable to Graham, Fossano rubbed her breasts on Graham not once but twice. (ECF No 20-3, PageID.263 (referencing dinner with Gwynn); ECF No. 20-18, PageID.724 (referencing Ledesma laughing).) Further, a reasonable jury could find that Fossano touched Graham's butt twice—Fossano allegedly slapped or squeezed Graham's butt at the booth and, when she placed chargers down his pants, she allegedly touched Graham's butt while saying "now you have them in your tush." (ECF No. 20-3, PageID.285–286, 324–325.) There is also evidence form which a jury could find that Fossano jumped into Graham's lap. (ECF No. 20-3, PageID.308.) Simply stated, this case involves more instances of sexual contact than *Clark* or *Bowman*. And the Sixth Circuit has indicated that *Bowman* may represent "the outer limits" of conduct that is not sexually hostile as a matter of law. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 569 (6th Cir. 2021).

And on top of Fossano's inappropriate touching, a reasonable jury could also find that Graham had to endure the following: Fossano telling him that a woman's breasts were the key to making sales and Fossano opening her legs toward him and stating, "don't worry, I'm wearing tights."

Taking this all together—multiple instances of sexual contact and multiple sexual remarks—HTC is not entitled to summary judgment because Graham lacks evidence of the "severe or pervasive" element.

But, says HTC, not all of the above incidents are "based on sex." According to HTC, if the harassment would have occurred regardless of whether Graham was a man or a woman, then it is not the type of harassment that concerns Title VII or ELCRA. (ECF No. 20, PageID.116.) Thus, says HTC, when assessing the severe-or-pervasive element, the Court should not have included Fossano's remark that *her* breasts helped with sales and that *she* was wearing tights. (ECF No. 20, PageID.117.)

The Court is not persuaded. True, as HTC claims, Graham must show that but for his sex, "[he] would not have been harassed in the way that [he] was." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021). But it is equally true that a comment can be "based on sex" even if it is not born of sexual desire or sexual animus. *Id.* 566–67. Here, HTC has no evidence that Fossano ever said "sales is about this" or "don't worry, I'm wearing tights" to another woman. Secondly, both of those comments clearly refer to a woman's body parts. *See id.* at 557 (noting that "breasts are a distinguishing feature and characteristic of [the plaintiff's] body as a woman" (internal quotation marks omitted)). Because Fossano's alleged remarks refer to "distinguishing feature[s] . . . of her body as a woman," and because a reasonable jury could find that Fossano would not have made the same remarks had Graham been a woman, it would be error to exclude the two remarks from the severe-or-pervasive calculus.

HTC also says other alleged harassing acts were not based on Graham's sex. (ECF No. 20, PageID.117.) But it is not necessary to decide whether HTC is correct

on this front: the Court has not relied on those alleged harassing acts in assessing the severe-or-pervasive element.

In sum, considering only the harassment that a reasonable jury could find was "based on sex," this Court cannot say as a matter of law that Graham was not subjected to severe or pervasive sexual harassment.

2.

Apart from the "based on sex" and "severe or pervasive" elements, HTC also argues that Graham lacks sufficient evidence of the employer liability element of a hostile-environment claim.

To better understand HTC's argument, a bit more law is helpful. Title VII treats harassment by a coworker and a supervisor differently. When the hostile environment is created by a supervisor, an employer is liable unless it can prove an affirmative defense. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005). That affirmative defense has two elements, one of which is that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). In contrast, when a coworker creates the hostile environment, the employee has the burden of showing that his employer knew (or should have known) of the hostile environment, yet "failed to take prompt and appropriate corrective action." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 311 (6th Cir. 2016). Some decisions applying the coworker test have even said that the employer's response must be "so indifferent to [the plaintiff's] concerns that it essentially permitted the harassment to continue." *Gwen v. Reg'l*

23

*Transit Auth.*, 7 F. App'x 496, 502 (6th Cir. 2001); *see also Nievaard v. City of Ann Arbor*, 124 F. App'x 948, 955 (6th Cir. 2005) ("[M]ere negligence in fashioning a response is not sufficient to hold an employer liable."). Under Michigan's Elliott-Larsen Civil Rights Act, courts apply a single test for employer liability: "an employer may avoid liability if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." *Radtke v. Everett*, 501 N.W.2d 155, 168 (Mich. 1993).

In this case, these three standards can be collapsed into one. The standard that is most favorable to HTC requires Graham to show that HTC's response to his complaints reflected indifference to Fossano's harassment. But, as will be explained, even under the most HTC-favorable standard, HTC is not entitled to summary judgment. It follows that HTC would not be entitled to summary judgment under the other two tests for employer liability.

Before turning to the facts of this case, the facts of a few other cases help illustrate what amounts to an appropriate employer response.

In *Collette v. Stein-Mart*, the Sixth Circuit found that, as a matter of law, Stein-Mart's response to the plaintiff's report of harassment was prompt and appropriate. 126 F. App'x 678, 686 (6th Cir. 2005). During a party, a manager made vulgar sexual advances toward the plaintiff, some of which involved inappropriate touching. *Id.* at 680. Stein-Mart responded swiftly. Within a day or two of learning of the manager's conduct, Stein-Mart suspended the manager pending the outcome of an investigation.

24

*Id.* at 686. And within six days of the plaintiff's report, the manager had been fired. *Id.*

Contrast *Collette* with *Smith v. Rock-Tenn Services*, 813 F.3d 298 (6th Cir. 2016). In *Smith*, the plaintiff reported to his employer that on one occasion, his coworker had slapped his butt, on another occasion, grabbed his butt forcefully, and on a third occasion, hunched over him from behind simulating sex. *Id.* at 303–304. And a couple months prior to the plaintiff's report, the employer had given the harasser a warning for engaging in similar conduct with another employee. *Id.* at 305. Despite this prior discipline, the employer did not investigate the plaintiff's report for 10 days, and, during that 10-day period, the plaintiff and harasser continued to work near each other. *Id.* at 311. Further, when the investigation was finally conducted, it was done poorly. *See id.* According to the Sixth Circuit, a reasonable jury could find "that [the employer's] total inaction for ten days, where [it] knew that [the harasser] had touched Plaintiff, and had [previously] told [the harasser] that further complaints would result in termination, was unreasonable." *Id.* at 312.

Finally, consider *Wyatt v. Nissan North America*, another case where the Sixth Circuit held that a reasonable jury could find the employer's response deficient. 999 F.3d 400, 414–15 (6th Cir. 2021). There, the plaintiff's supervisor used false pretenses to get the plaintiff to stop at a hotel with him, and while in the hotel room, exposed himself and sexually assaulted the plaintiff. *Id.* at 408–09. The next month, the supervisor rubbed the plaintiff's shoulders down to her buttocks while at work, even

25

after the plaintiff told him to stop. *Id.* at 409. When the plaintiff reported the supervisor's touching (but not the hotel incident) to a manager, the manger took nine days to relay the report to human resources. *Id.* at 414. Human resources then took another two weeks to interview the plaintiff. *Id.* at 415. During the interview, the plaintiff described the harassing conduct, including the hotel incident. *Id.* at 415. Even so, the employer waited six more days to interview the harasser and remove him from the workplace. *Id.* at 409. The Sixth Circuit concluded, "[the employer's] three-week delay in investigating an explicit and specific sexual harassment complaint suffices to defeat summary judgment." *Id.* at 415. This was true even if the supervisor was classified as a coworker. *See id.* at 417.

Now to the facts of this case. HTC says that when Graham reported Fossano's harassment in February 2019, it "took prompt and appropriate corrective action." (ECF No. 20, PageID.122.) It is true that when Graham returned from the conference and told his supervisor, Prasad, that Fossano had slapped him on the butt, Prasad went to human resources within an hour. (ECF No. 20-4, PageID.497.) And it is true that on March 4 and March 6, 2019, human resources met with Graham and compiled a list of Fossano's alleged misconduct. (ECF No. 20-16, PageID.719; ECF No. 20-18, PageID.724.) Further, as HTC points out, it then conducted an internal investigation. And by April 2019, Fossano had been disciplined for her conduct, Graham had been moved to another floor, and the entire company would soon undergo harassment training. And after the investigation, Fossano never again harassed Graham.

Those facts suggest that HTC did a better job than Rock-Tenn Services in *Smith* or Nissan in *Wyatt*. But those facts are not the whole story. And upon hearing the whole story, a reasonable jury could find that HTC's response to Graham's complaints amounted to indifference.

The full story begins not with Graham's report in early 2019, but with Graham's report in early 2017. That report included allegations that Fossano had said that a woman's breasts were the key to sales and that she had opened her legs in an awkward manner and said that she was "wearing tights." And Graham says that when he met with CareTech's Vice President of Human Resources in 2017, "[Vaishya's] response to me was . . . listen, you're not the only person that reported [Fossano]. [CareTech President Tommi White] and I have already met with her, and . . . I will take care of it." (ECF No. 20-3, PageID.232–233; *see also* ECF No. 20-18, PageID.724.) In other words, a reasonable jury could find Vaishya specifically and HTC generally were aware that Graham had made allegations of sexual harassment and that at least one other employee also believed that Fossano had engaged in unprofessional behavior. Yet, CareTech's only response was its president telling Fossano to act "professionally in the workplace." (ECF No. 20-5, PageID.582.) HTC did not give Fossano any written discipline and did not separate Fossano from Graham. HTC did not even take the relatively simple measure of following up with Graham in, say, six months to see if the harassment had stopped. And, according to Graham, it did not stop. Between his early 2017 report and his early 2019 report,

Fossano allegedly rubbed her breasts on Graham, jumped into his lap, and slapped him on the butt.

Only with this prologue can HTC's account of its 2019 response be properly evaluated. And even then, there are additional facts that HTC's account omits. Although not entirely consistent on the point, Graham believes he reported the butt slap to Prasad almost immediately after he returned from the January 2019 conference. (*Compare* ECF No. 20-3, PageID.283, *with* ECF No. 20-3, PageID.288–289.) If that is true, then HTC waited *six* weeks before interviewing Graham on March 4 and 6, 2019. Second, although Prasad went to human resources within an hour of Graham's report, Prasad apparently minimized Fossano's conduct: "I just [told HR] what I heard, what I thought I heard, that it seems that Jill has spanked him on the *back* and he felt offended by it and he intends to lodge a complaint." (ECF No. 20-4, PageID.497 (emphasis added).) Not only is "back" quite different than "butt," Graham had told Prasad back in 2018 that Fossano had a history of making sexually suggestive statements to him. (ECF No. 20-3, PageID.258.) Third, when Vaishya—who was aware of the 2017 allegations—and Cleveland finally met with Graham on March 4 and 6, HTC learned of troubling allegations of sexual touching, including that Fossano had rubbed her breasts on Graham. (ECF No. 20-16, PageID.719; ECF No. 20-18, PageID.724–725.) Equally significantly, during the two March meetings, Graham told Vaishya and human resources that Fossano had invited another employee, Marcelle Wallace, under the sheets during a work trip and that Fossano had tried to kiss Wallace. (ECF No. 20-16, PageID.719.) (Wallace

subsequently told human resources that she had shared Fossano's conduct with Graham, but that she was upset that Graham had shared it with human resources, and that she did not want to file a complaint against Fossano. (ECF No. 20-5, PageID.667–668.))

A summary of the story up through March 6, 2019 is in order. Taking the evidence in the light most favorable to Graham, Vaishya specifically and HTC generally, were aware of the following after the March 6 meeting: (1) despite that Fossano had been warned in 2017, Graham was reporting that Fossano's harassment had continued, (2) the reported harassment included sexual touching, including Fossano's breasts and Graham's butt, and (3) Fossano had allegedly sexually harassed another employee, Wallace.

Yet, despite this knowledge, HTC did not move with urgency after March 6. Based on emails that are part of the record, March 14—eight days after the March 6 meeting—was the first day that human resources interviewed anyone about Graham's complaints. (*Compare* ECF No. 20-20, PageID.745, *with* ECF No. 20-19, PageID.733.) On that very day, Fossano allegedly sexually harassed Graham again: she put phone chargers down his pants and stated, "now you have them in your tush." (ECF No. 20-20, PageID.745.) From the time Graham reported the butt slap to Prasad in January or February 2019 up through March 14, 2019—even considering Fossano's absence after some surgery—Fossano was not suspended pending an investigation, Fossano and Graham were not separated pending an investigation, and there is no indication that anyone was monitoring Fossano's interactions with Graham. *See*

29

*Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 312 (6th Cir. 2016) (holding that jury could find employer response inadequate where employer "did not separate the two men, suspend [the alleged harasser] pending an investigation, or initiate its investigation in a timely manner"). Had any of those actions been taken, it is likely that the last incident of harassment on March 14 would not have occurred.

In short, based on the version of the story that favors Graham (which, is the story that must be accepted at the summary-judgment stage) a reasonable jury could find that HTC was "so indifferent to [Graham's] concerns that it essentially permitted the harassment to continue," *Gwen v. Reg'l Transit Auth.*, 7 F. App'x 496, 502 (6th Cir. 2001).

\* \* \*

In sum, a reasonable jury could find that Graham was subjected to severe or pervasive sexual harassment that affected his working conditions and that upon learning of the harassment, HTC did not take adequate measures to halt it. Accordingly, HTC is not entitled to summary judgment on Graham's hostile-environment claims under Title VII and ELCRA.

B.

Graham also claims that HTC violated Title VII and ELCRA by more harshly scrutinizing his performance, stripping him of 90 percent of his job duties, and, ultimately, terminating his employment after he complained about Fossano's sexual harassment. HTC also seeks summary judgment on these retaliation claims.

30

The framework for analyzing retaliation claims depends on whether there is direct or indirect evidence of retaliation. Here, "[Graham] [has] not present[ed] any direct evidence of retaliation, such as an explicit statement from [HTC] that it was firing him in response to his [harassment] claims." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). And when there is only circumstantial evidence of retaliation, courts use the *McDonnell Douglas* framework to analyze retaliation claims under Title VII and ELCRA. *See Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021).

Under the *McDonnell Douglas* framework, Graham has the initial burden of establishing a prima facie case of retaliation. *See Jackson*, 999 F.3d at 344. If he succeeds, then HTC has the burden of producing evidence that it terminated Graham's employment for a non-retaliatory reason. *Id.* If HTC succeeds, then Graham has the opportunity to show that HTC's asserted basis for his termination is merely pretext for retaliation. *See id.* And under both Title VII and ELCRA, Graham must ultimately show that had he not complained about Fossano, he would have kept his job. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013) (providing that Title VII requires but-for causation); *Patel v. Trinity Health Corp.*, No. 20-10517, 2021 WL 4894637, at *14 (E.D. Mich. Oct. 20, 2021) (summarizing case law regarding ELCRA's causation standard).

1.

The Court need not and does not decide whether Graham has established a prima facie case of retaliation. Even if Graham has discharged his burden at step one,

31

HTC has evidence of non-retaliatory reasons for terminating Graham's employment, and Graham has not shown that those reasons are pretext for retaliation.

2.

Regarding step two of the *McDonnell Douglas* framework, HTC asserts that it terminated Graham's employment because of his "poor performance," the "lack of a plan to improve that performance," and corporate downsizing at CareTech. (ECF No. 20, PageID.126.)

HTC has carried its burden of producing evidence supporting these non-retaliatory reasons for Graham's termination. Prasad (Graham's supervisor) testified that over time, he formed an opinion that Graham was less competent at his job than he had initially thought and that none of the sales leads that Graham assisted on ended up closing. (ECF No. 20-4, PageID.491, 520.) And it is not disputed that Prasad gave Graham two weeks to prepare a plan for turning things around, but Graham never provided Prasad with a plan to succeed in his existing role, which primarily involved HTC and Ciber. (ECF No. 20-4, PageID.539–540.) Instead, Graham's proffered "plan" was to have his prior job duties with CareTech restored. (ECF No. 20-3, PageID.375.) Finally, as to the staff reductions at CareTech, Vaishya testified that CareTech's revenue had markedly decreased since it had been acquired by HTC and that staff reductions had started at the end of 2018 and continued after Graham was terminated. (ECF No. 20-5, PageID.601–602.) Additionally, HTC has also produced a long list of employees that were terminated during 2019 and 2020. (ECF

32

No. 25-3, PageID.847–850.) Taking all of this together, HTC has shouldered its burden at step two.

3.

At the third and final step of the *McDonnell Douglas* framework, a plaintiff has the opportunity to show that the employer's proffered reasons for the adverse action are pretext for retaliation. Most of the time, a plaintiff attempts to establish pretext in "one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (internal quotation marks omitted). "But . . . these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.*

That last point about the "ultimate inquiry" means that the Court will also consider Graham's evidence of causation at the pretext stage. After all, each piece of evidence that supports Graham's claim that his complaints about Fossano were the but-for cause of his termination undercuts HTC's claim that his performance, lack of an improvement plan, and staff reductions were the causes. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 108 n.2 (6th Cir. 2005).

In attempting to show that his complaints about Fossano in February and March 2019 led to his termination, Graham stresses that after he made those complaints, Prasad subjected him to greater scrutiny and changed his job duties.

(ECF No. 23, PageID.795, 810.) Graham says that before his complaints, Prasad had never discussed specific goals or measurements with him. (ECF No. 20-3, PageID.359.) And Graham asserts that starting in April or May 2019, Prasad prevented him from working with the CareTech sales team, which represented 90 percent of his work. (ECF No. 20-3, PageID.361.) Graham says that Prasad left him with only the HTC and Ciber sales teams, which represented only 10 percent of this work. (ECF No. 20-3, PageID.361.)

Graham's argument is, in essence, an attack on HTC's assertion that Graham's poor performance led to his termination. As this Court understands Graham's argument, even if he was not performing up to Prasad's standards in 2019, that was because Prasad had stripped him of CareTech opportunities and was being more critical of his performance. And says Graham, the reason Prasad took those actions was because of the complaints about Fossano in early 2019.

Although temporal proximity lends some support to Graham's retaliation theory, Prasad has offered non-retaliatory, business reasons for his actions, and timing alone cannot show that these reasons are pretextual. *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 516 (6th Cir. 2021) ("[T]emporal proximity cannot be the sole basis for finding pretext[.]").

As for the increased scrutiny, Prasad's testimony suggests that the monthly or weekly business-review meetings were either standard fare or were necessitated by the financial reports. Prasad recalls, "It's a standard practice that we have to show what we've done for the quarter, what has the business unit done for the quarter. So

34

I had a conversation with [Graham] in November of 2018, and then come January, February [2019], every month we are having the meetings. . . . I think in February of 2019 I said, . . . 'What do we have to show?' when they have to show it . . . on the dashboard, 'What are we going to have to show about the results?'" (ECF No. 20-4, PageID.524–525.) Indeed, although they were not what would normally be considered performance-improvement plans, Prasad testified that the quarterly business reviews were similar to performance-improvement plans in the sense that Graham had 90 days to show improvement in the objectives or numbers. (ECF No. 20-4, PageID.526.)

As for the change in Graham's job duties, Prasad testified that beginning in July 2018, he had directed CareTech managers to handle more of the operations issues and had directed CareTech salespeople to handle more of the sales issues. (ECF No. 20-4, PageID.463; *see also* ECF No. 20-4, PageID.518–519.) As such, Graham's responsibilities with CareTech started diminishing. (ECF No. 20-4, PageID.462–463, 513, 518.) So eventually Prasad asked Graham to work less with CareTech. (ECF No. 20-4, PageID.518–519 (noting that CareTech was "overstaffed").) Prasad wanted Graham to assist "the HTC and the Ciber salespeople"; "the expectations were that [Graham] was going to coach those salespeople, work with those salespeople on developing opportunities and then helping driving sales and closing that business." (ECF No. 20-4, PageID.513.)

And a second fact cuts strongly against Graham's theory that Prasad retaliated by scrutinizing his performance more harshly and by stripping him of CareTech work:

there was little, if any, motive for Prasad to retaliate. Graham's complaint of sexual harassment was against Fossano—not Prasad. Graham has pointed to no evidence that Prasad had any type of personal relationship with Fossano. Further, although Prasad initially relayed Graham's complaint about the butt slap to human resources, it appears that was the whole of his involvement with Graham's sexual harassment complaint. It was human resources (and HTC's finance director) who investigated Graham's complaints. And Prasad was not involved in disciplining Fossano, either. (ECF No. 20-5, PageID.626–627.)

In short, while timing may lend some support to Graham's claim that Prasad retaliated after he complained about Fossano, considerable other evidence cuts the other way. No reasonable jury could find that but-for Graham's complaints about Fossano, Prasad would have scrutinized Graham's performance less harshly and allowed Graham to continue working with the CareTech sales team.

Graham makes a few other attempts to show that HTC's reasons for terminating his employment are pretextual; none persuade.

For one, Graham argues that Prasad faulted him for poor sales, but that the marketing department was responsible for generating leads and that salespeople were responsible for closing sales. (ECF No. 23, PageID.811.) While that may be technically true, Graham himself testified that it was his job to support and advise the salespeople, i.e., his job was to help sell the service-desk product. (*See* ECF No. 20-3, PageID.197–198, 200–201.) Indeed, Graham was a vice president of *business development*. (ECF No. 20-3, PageID.196–197.) And according to Prasad, "[Graham's]

36

role in business development [was] to . . . work with the various salespeople, court [customers] when needed, dine them when needed, help develop proposals where needed, and make presentations when needed with his help and essentially bubble up those [leads] into actual sales." (ECF No. 20-4, PageID.517.) So there is nothing pretextual about Prasad holding Graham responsible for poor sales numbers.

Graham also argues that because HTC has failed to "identify any specific ways in which his performance was deficient," a jury could be skeptical of HTC's claim of poor performance. (ECF No. 23, PageID.811.) But Prasad did testify to some specific issues: Graham either did not make sales presentations or proposals, or, when he did, they were not well done (ECF No. 20-4, PageID.478, 522–523), the sales numbers for the second quarter of 2019 were poor (ECF No. 20-4, PageID.528, 531; *see also* ECF No. 20-11, PageID.799), the entire time that he had supervised Graham, not a single sales lead that Graham worked on had closed (ECF No. 20-4, PageID.491; *see also* ECF No. 20-13, PageID.709), and he gave Graham two weeks to come up with a plan to turn things around, but Graham's only plan was to return to his work with the CareTech sales team (ECF No. 20-3, PageID.375).

Graham also argues that while HTC has "produced a list of employees who were terminated as part of a reduction in force in 2019 and 2020," no one at his management level was released before him. (ECF No. 23, PageID.811.) But in its reply brief, HTC says three employees at Graham's level were released before Graham or during the same month as Graham. (ECF No. 20, PageID.839.) Graham has submitted a proposed sur-reply, but the sur-reply does not dispute this claim by

HTC. (*See generally* ECF No. 28.) Moreover, it is not disputed that CareTech underwent downsizing and that no one has ever been hired into Graham's specific position. (ECF No. 20-5, PageID.601.)

In all, Graham has not shown that HTC's reasons for his termination are pretextual.

* * *

In sum, assuming (without deciding) that Graham has established a prima facie case of retaliation, HTC has produced sufficient evidence that it terminated Graham's employment because of his performance, failure to submit an improvement plan, and downsizing at CareTech. And Graham has not shown that these reasons are a pretext for retaliation.

## IV.

For the reasons given, CareTech, Ciber, HTC Global Acquisition, and HTC Global Service's motion for summary judgment (ECF No. 20) is GRANTED IN PART. Graham's claims that Defendants retaliated because he complained of sexual harassment (Counts II and IV) are DISMISSED. But Graham's claims that Defendants are liable for a hostile work environment (Counts I and III) will proceed to trial.

Lastly, because Graham's sur-reply does not alter the Court's findings in this opinion or otherwise prejudice Defendants, the Court will GRANT Graham's motion for leave to file a sur-reply (ECF No. 26).

SO ORDERED.

Dated: January 11, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE